ALICE F. HOLLIDAY, Plaintiff, *v.* HARRISON B. McGRAW, as Assignee for the Benefit of Creditors of GEORGE J. WORTHINGTON and WARREN H. COLSON, Defendants.

(Supreme Court, Erie Equity Term, March, 1919.)

Assignment for benefit of creditors — duties of assignee — contracts — jurisdiction — parties — chattel mortgages — assignments — foreclosure — services — costs — accounting — Lien Law, § 303.

After the mortgagor of the " Worthington Collection " of postage stamps had made in the state of Ohio a general assignment for the benefit of creditors, an action was brought in the state of New York against him, his assignee and others, for the foreclosure of the mortgage, and by the judgment entered in said action the court found *inter alia* that the stamps were in the state of Ohio when the mortgage was made, that the mortgagor had failed to keep his agreement to forward them to the mortgagee and from time to time, without her knowledge or consent, had pledged a part of the collection to one C., a sales agent, with authority to sell the same; that the mortgagee upon learning the facts protested that such course was in violation of her rights; that from the time C. was notified that the collection had been turned over to the mortgagee, and that he must account to her for any sales, he recognized her as the owner of the stamps and that she had a lien thereon for the amount of a note the mortgagor had given to her; that all of the stamps theretofore delivered to C. and unsold had been delivered by him to the mortgagee and were in her possession at the time of the trial of the action. The judgment entered therein establishing plaintiff's lien, decreed that the stamps be sold at public sale after notice of the time and place of sale as required by law and that plaintiff have judgment for any deficiency. After the mortgagee, pursuant to the Lien Law, had given notice of her intention to sell the stamps at public sale, she entered into an agreement in writing with the assignee for creditors by which he was to pay her a certain sum conceded to be due; that she should deliver the stamps to him and that he should deposit a certain sum of money to the credit of two designated persons, as trustees, to await the adjustment or adjudication of disputed

questions, but the parties being unable to agree, the present action, to which C. was made a party defendant, was brought by the mortgagee to determine the rights of the parties under said agreement and to the trust fund deposited thereunder and for distribution. *Held:*

That the purpose of the agreement was to enable the assignee for creditors to redeem and secure possession of the stamps unsold, which he was able to do only by securing plaintiff with respect to the balance of her claim.

Though without the presence of C. the matters in controversy between the plaintiff and the assignee for creditors could have been determined, still, in order to avoid a multiplicity of suits and that there might be a complete determination of said matters, C. was properly joined as a defendant and the court had jurisdiction to make a final determination of the controversies binding upon all the parties.

Though it was stipulated that the action should be brought by the mortgagee it is in effect an action by the assignee for creditors, for an adjudication with respect to the terms and conditions upon which he was entitled to a complete redemption, and the deposit of the trust fund was to secure payment to the mortgagee of the amount to which she might be entitled upon such redemption.

The scope of the action is neither limited by the notice served by plaintiff with respect to the amount of her lien and the advertisement of sale, nor by the provisions of section 303 of the Lien Law.

Where, when the assignee for creditors attempted to redeem, C. refused to return unsold stamps and the proceeds of stamps sold, for which he had not accounted, but after the commencement of the action deposited the unsold stamps into court, the assignee cannot charge plaintiff with the value thereof, his only right being to have them delivered to him the same as if he had sued for redemption, and all the stamps having been sold for their full market value, though not at public auction, the assignee was not prejudiced by the sale.

No claim being made that C. was not a proper person to employ to sell the stamps or that either he or plaintiff was guilty of any negligence in respect thereto, and no reason to doubt that the outstanding claims against purchasers and C. are collectible, the credit of the sales in the circumstances should be borne by the assignee for creditors and not by plaintiff.

Plaintiff is entitled to have the amount of her lien and necessary expenses in preserving and handling the stamps together with the costs of the action to be taxed, and to an additional allowance of $2,000 out of the fund deposited in court with interest thereon payable by the depositary. The decree to be entered herein to provide that plaintiff should execute an assignment in due form and duly acknowledged to the assignee for creditors of her claims against the purchasers who have not paid in full, and against C.

C. is entitled to deduct from the money in his hands for services rendered in remounting stamps, thereby enabling plaintiff to deliver them in more valuable condition to the assignee, and to his commissions on stamps sold. He is accountable to the plaintiff for the money in his hands and she should assign her right thereto to the assignee for creditors and also assign to C. a one-fifth interest in the outstanding account for stamps sold, unless the parties otherwise agree before the settlement of the decision to be entered herein. C. is also entitled to appropriate findings and conclusions of law to the effect that neither by his surrender of the stamps which were sold by the assignee nor by the delivery of the remaining stamps into court did he waive or lose any right he had in the premises.

A decision in accordance with the above views and awarding the stamps and the balance of the fund to the assignee for creditors may be presented for settlement on notice.

This is a suit in equity to establish the rights of the plaintiff and the defendant McGraw, as assignee, under and pursuant to an agreement in writing made and entered into by them on the 22d day of June, 1917, and to a trust fund deposited thereunder, and for the distribution thereof, and the issues were tried at the Erie Special Term for the trial of issues of fact without a jury for May, 1918.

Wallace Thayer, for plaintiff.

Daniel J. Kenefick, for defendant McGraw, as assignee.

Louis L. Babcock, for defendant Colson.

LAUGHLIN, J.  On the 7th day of May, 1912, the assignor, George H. Worthington, was the owner of a large and valuable collection of postage stamps, mounted in about sixty volumes, known as the Worthington Collection, and on that day he executed a mortgage thereon to the plaintiff, as collateral security for his promissory note, payable to her, bearing even date therewith, for $337,500, payable on or before two years from date.  The consideration for the note was a loan of 1,500 shares of the common stock of the American Chicle Company, then owned by and in possession of the plaintiff, the market value of which was the amount of the note.  Worthington was to have the right to pledge the stock, and it was contemplated that thereby he might become disabled from returning it. It was agreed between the plaintiff and Worthington, in effect, that at the expiration of two years he should return the stock, or such of it as he had on hand, and in the event of his inability or failure to return any of it, he should pay the whole amount of the note, and in the event of his returning part of it, he should pay the note less the value of the stock when so returned. He pledged the stock as contemplated, and the title subsequently passed to the pledgee.  He paid on the note only the sum of $25,500, and that sum was paid in installments, after the note became due, from the proceeds of the sale of the stamps.

He was a resident of Cleveland, O., and the plaintiff was a resident of Buffalo, N. Y.  On the 25th day of September, 1915, he made an assignment pursuant to the statutory law of Ohio, to the defendant McGraw, for the benefit of creditors, and the assignment became effective on the 27th or 29th of September, 1915. Thereafter the plaintiff brought an action in the Supreme Court, Erie county, N. Y., against Worthington, McGraw as assignee, and others, for the fore-

closure of the chattel mortgage. The issues thereunder were tried, and a decision thereon filed on the 13th day of February, 1917, and judgment entered thereon four days later. The court found, among other things, that when the chattel mortgage was executed, the stamps were in Cleveland, O.; but that Worthington agreed to forward them to the plaintiff as soon as he could have them properly mounted and shipped; that he failed to perform that agreement, and without the plaintiff's knowledge or consent, pledged part of the collection from time to time from the 2d day of March, to the 11th day of November, 1914, to Colson, the defendant herein, a sales agent, with authority to sell the same; that plaintiff from time to time demanded that he ship the stamps to her, and between September 28, 1914, and June 28, 1915, he shipped a large part thereof to her; that when the plaintiff discovered that he had been or was trying to sell the stamps, she protested that it was in violation of her rights; that on the 20th of May, 1915, Worthington wrote Colson that he had turned the collection over to the plaintiff and to account to her for any sales made; that on the 2d of June, 1915, the plaintiff expressed to Colson part of the stamps she had received from Worthington and wrote him saying that she had been informed that he understood that she had a right to a lien on the stamps and that she would expect him to account to her and to confer with her concerning prospective purchasers of the stamps she was then forwarding to him and all other stamps she might send to him; that from this time on Colson recognized the plaintiff as the owner and having a first lien on the stamps for the amount of the note; that after May 6, 1915, Colson transmitted to the plaintiff in installments, the said sum of $25,500, credited on the note, as the net proceeds of sales received by

him after deducting his commissions, and the sum of $6,000 to reimburse him for advances made by him to Worthington on said 6th day of May, 1915, without the plaintiff's knowledge or consent; that all of the stamps theretofore delivered to Colson and unsold, had been delivered to the plaintiff by him and were in her possession at the time of the trial of the issues in that action; that the plaintiff has retained possession of all of the stamps upon which she claimed a lien, with the exception that she let Worthington have and pledge part of them for a personal loan to him, and she was obliged to pay $15,000 to redeem them therefrom, and that it was not shown that the plaintiff had acquiesced in the sale of any stamps by Worthington or in the payment of the proceeds of the sale of any stamps by Colson to Worthington. The amount of the plaintiff's lien on the stamps was established by the decision and judgment in that action as $346.602.30, and costs were awarded to her, and it was decreed that the stamps should be sold at public sale to the highest bidder in accordance with the rules of law and practice of the court in the case of the foreclosure of chattel mortgages or pledges, after giving notice of the time and place of sale, as required by law, and that the plaintiff should have a judgment against Worthington for any deficiency.

The plaintiff gave notice, pursuant to the Lien Law, of her intention to sell the stamps at public sale on the 29th of May, 1917, and the sale was adjourned until the twenty-ninth of June thereafter. In the meantime and on the 22d day of June, 1917, the plaintiff and McGraw, as assignee, entered into the agreement in writing , upon which this action is based. It is recited therein that the assignee was the owner of the stamps and ready to redeem them by paying the amount of the plaintiff's lien and the expenses of serving notice and

advertising the sale; that by receipts from the proceeds of the sale of the stamps through Colson, not adjusted in the other action, the plaintiff's claim had been reduced to $327,278.14, which it was stipulated on the trial hereof involved a clerical error, and should have been $327,796.77; that Colson had received on account of the sales of stamps, further sums aggregating $31,868.41, which he had not paid over to the plaintiff, and that he claimed $7,995.26 thereof as commissions for making the sales, and also claimed a lien on the balance, and refused to account therefor, and that plaintiff or her assignor had delivered to Colson to sell, at private sale, certain of the stamps of the estimated value of $55,000, which he still held unsold, and asserted a lien thereon, and refused to surrender them to the plaintiff, who was thereby rendered unable to deliver them to the assignee; that the plaintiff claimed that the assignee should pay, as a condition of exercising his right of redemption, her attorney's bill for services in the other action, and in the said steps taken with a view to selling the stamps, amounting to $10,827, and a bill rendered by counsel employed on the trial of the other action for $2,500, and her expenses in connection with the stamps, aggregating $1,115, all of which amounts she claimed to be reasonable charges, and that the assignee denied liability therefor or liability in the amount claimed; that the assignee claimed that the $31,868.41 collected and not accounted for by Colson, should be credited on the plaintiff's lien, and that the plaintiff claimed that Colson was entitled to deduct therefrom his said claim for commissions, and that the assignee should look to Colson for the balance; that the assignee claimed that the remaining stamps then in Colson's hands should be delivered to him, or the value thereof credited on the plaintiff's claim, and that the plaintiff claimed that the assignee

should look to Colson for the return of the unsold stamps; that both parties deemed it desirable that a redemption should be effected, and that the stamps in the plaintiff's possession should be delivered to the assignee upon his paying the part of her claim not disputed, and upon his depositing a further sum to await the voluntary adjustment or legal determination of the disputed questions. After making these recitals in the form of preambles, the parties agreed that the assignee should pay the plaintiff the sum of $240,409.78, conceded to be due, and that the plaintiff should deliver all the stamps in her possession to him, and that the assignee should deposit $101,310.41 in the Bankers Trust Company to the credit of Judge Kenefick and Mr. Thayer, as trustees, to await the adjustment or adjudication of the disputed questions, and it was further agreed that if there was no adjustment of the controversy within thirty days, then the plaintiff should commence an action for an adjudication with respect thereto. The plaintiff and the assignee were unable to adjust their differences and she then brought this action alleging these facts and making Colson a party defendant, and demanded that the rights of the respective parties in and to the fund so deposited, and in and to the money and stamps in Colson's hands, be determined, and that she be paid the full amount of her remaining claim as it shall be augmented by said attorney and counsel charges and expenses, and that after payment of the plaintiff's claim in full, and costs, that the residue of the money and stamps be turned over to the defendants in accordance with their rights and interests in the premises and for such other and further relief as may be just and proper.

At the outset counsel for the assignee contended that Colson was not a proper party and that this litigation should be confined to litigating the rights of the plain-

tiff and the assignee with respect to the funds so deposited under the agreement of June 22, 1917, and that in any event if litigation is to be extended to an accounting by Colson to the plaintiff and an adjustment of their respective rights as against each other, as principal and agent, the adjudication with respect to those issues does not concern the assignee, who, therefore, should not be bound thereby. I overruled that contention on the trial, and after extended argument and further reflection I adhere to my ruling. Cash payment in full was made by the assignee on the redemption of the stamps then in the actual possession of the plaintiff and surrendered to him by her, and the controversy presented by the recitals of the agreement, the substance of which I have stated, was only with respect to how the redemption of unsold stamps was to be effected by the assignee and whether he was to be obliged to comply with all, or any, of the conditions exacted by the plaintiff, and whether the plaintiff was liable to him for the moneys received and unaccounted for by Colson and for the unsold stamps held by Colson, as the assignee claimed; or whether, as the plaintiff claimed, the assignee was to look to Colson therefor. At the time the agreement of June 22, 1917, was made, the plaintiff had advertised a sale of the property pursuant to the provisions of section 202 of the Lien Law and the sale had been adjourned by consent until the twenty-ninth of that month. Pursuant to the provisions of section 203 of the Lien Law, the assignee attempted to make a redemption by offering to pay the amount of the plaintiff's lien, as specified in the notice duly served demanding payment thereof prior to advertising the sale and the expenses of serving the notice and of publishing the advertisement of the sale; and he claimed that by virtue of the provisions of said section of the Lien Law he thereupon became

Supreme Court, March, 1919. [Vol. 106.

entitled to have delivered to him all of the stamps not accounted for as sold in the action to foreclose the chattel mortgage upon paying the amount of the plaintiff's lien and said expenses, which he was ready and willing to pay. There is force in that contention and it is the principal basis upon which the assignee claims that Colson is not a proper party. Owing to the facts recited in said agreement, however, the redemption could not be affected on the basis offered and the parties were unable to agree with respect thereto. The plaintiff was then in a position to proceed with the sale and sell the stamps in her possession, leaving the other questions to be decided on further application to the court in the foreclosure action or in any other litigation that might be instituted by either party. The assignee, on the other hand, might have then applied, in the foreclosure action or in another suit that he might have instituted, to enjoin the sale on the ground that he had made a sufficient tender to entitle him to a redemption. Both parties evidently deemed it to their interest to take another course, and accordingly they made the agreement of June 22, 1917. By that agreement the assignee conceded that the plaintiff was entitled to the cash payment made thereunder as a condition of delivering to him the unsold stamps then actually in her possession; but it is fairly to be inferred that the plaintiff was unwilling to deliver those stamps on such payment without security for her other claims recited in the agreement, which were disputed. The purpose of the agreement, therefore, was to enable the assignee to redeem and secure possession of the unsold stamps, which he was able to do only by securing the plaintiff with respect to the balance of her claim, and it was agreed that the controversies with respect to the balance of her claim, if not adjusted amicably, were to be adjudicated in an action to be brought by the

plaintiff against the assignee. Doubtless those controversies could have been determined as between the plaintiff and the assignee without the presence of Colson; but it is manifest that a judgment between them only could not completely determine the controversies necessarily involved in the litigation. It would be necessary to make findings with respect to Colson's agency and accountability and with respect to whether the assignee should be credited with the amount collected and unaccounted for by Colson and with the value of the stamps in Colson's possession, which he had refused to deliver, or whether the plaintiff should be paid in cash the entire balance of her claim and the assignee should be required to look to Colson with respect to these matters, or should be required to take the unsold stamps remaining in Colson's possession. Findings on these points, without the presence of Colson, would be final between the plaintiff and the assignee; but they would not be binding on Colson when sued by the party thus adjudged to be entitled to call him to account. It also seemed quite plain to me that in any event the only right of the assignee with respect to the unsold stamps was to redeem them and have them delivered to him; and Colson having asserted a lien both on the money remaining in his hands as the proceeds of sales of stamps and on the unsold stamps in his possession, and having refused to account therefor, no effective decree with respect thereto, and particularly for the redemption of the unsold stamps, could be made without the presence of Colson as a party. Therefore, in order to avoid a multiplicity of suits and that there may be a complete determination of the controversies, Colson was properly joined as a party defendant herein and it was competent for the court to take entire jurisdiction of the controversies so far as presented by the pleadings

and to make a final determination therein binding upon all the parties hereto. *Metropolitan Trust Co.* v. *Stallo,* 166 App. Div. 649; affd., 215 N. Y. 710. These views were repeatedly suggested to counsel throughout the trial, but unfortunately the pleadings do not present, and have not been amended so as to present, the entire controversies; for neither the plaintiff nor the assignee makes any affirmative claim for relief as against Colson, and Colson makes no claim for affirmative relief as against either of them. The only relief prayed for by any party is with respect to the fund deposited in court and to the moneys and stamps in the hands of Colson. Colson, however, has delivered into court, subject to the order of the court herein, all of the unsold stamps; and the court, therefore, may decree the disposition to be made thereof; and while it might not be competent for the court, owing to the state of the pleadings to which attention has been drawn, to enter a judgment in favor of the plaintiff or the assignee against Colson with respect to the moneys collected and unaccounted for, and with respect to certain outstanding accounts for stamps sold by Colson, for which he has not collected, it is, I think, competent for the court to make a binding determination with respect to the facts and so to decide the rights of the parties as to make the findings conclusive upon them as evidence in any other action that it may be necessary to bring.

The provisions of the agreement of June 22, 1917, have been sufficiently stated. They clearly show that it was intended thereby to effect a *complete redemption* by the assignee as of that date. The deposit was made for the reason that they were unable to agree upon the amount to which the mortgagee was entitled, and this action was brought pursuant to the terms of the agreement for precisely the same reason.

Although they stipulated that it should be brought by the mortgagee, it is in effect an action by the assignee for a judicial decision with respect to the terms and conditions upon which he was entitled to have a complete redemption, and the fund was deposited to secure payment to the mortgagee of the amount to which she may be entitled on the redemption.

I am of opinion that the scope of the action is not to be limited by the notice served by the plaintiff with respect to the amount of her lien and the advertisement of the sale, or by the provisions of said section 203 of the Lien Law. It is a suit in equity and a decision of the points presented requires a consideration of the legal and equitable status of the parties at the time the agreement upon which the action is founded was made. The mortgage contained no provision with respect to a foreclosure thereof or a sale of the property by the mortgagee; but nevertheless, long prior to the making of said agreement, and before the assignee acquired any rights in the premises, the legal title to the stamps by the default of the mortgagor in paying the indebtedness to secure which the mortgage was given, there being no evidence of a waiver of the default (*Earle* v. *Gorham Mfg. Co.,* 2 App. Div. 460) had become vested in the plaintiff, the mortgagee, and the only right that remained in the mortgagor, after the default, and to which his assignee succeeded, was the right to bring a suit in equity for the redemption of the property, in so far as it had not been lawfully sold by the mortgagee, on paying the indebtedness and interest thereon and all reasonable disbursements made by the mortgagee in recovering, caring for and preserving the property, less the proceeds of sales lawfully made by her and the market value of any stamps disposed of by her by sales not fairly made in a manner calculated to realize the mar-

43

ket value of the property. *Bragelman* v., *Daue*, 69
N. Y. 69; *Coe* v. *Cassidy*, 72 id. 133; *Casserly* v.
*Witherbee*, 119 id. 526; *Kimball* v. *Farmers &
M. National Bank*, 138 id. 500–504; *Barrett Mfg.
Co.* v. *Van Ronk*, 212 id. 90–94; *Reich* v. *Coch-
ran*, 213 id. 416–421; *Darrow* v. *Wendelstadt*,
43 App. Div. 426; *Cody* v. *First National Bank*, 63
id. 199; *Cartier* v. *Pabst Brewing Co.*, 112 id. 419;
*Schmidt* v. *Weeks*, 142 id. 83; Jones Chat. Mort. (4th
ed.), §§ 683, 699, 707; 7 Cyc. 89–92. The right, of
redemption could only be cut off by foreclosure sale or
a sale on reasonable notice to the mortgagor (Jones,
*supra*, §§ 790–791), but the mortgagee, acting in good
faith, could sell at public or private sale and would be
entitled to be credited with the proceeds of the sales
provided they were fairly made, and inasmuch as
there was no express provision for private sale, for
the value of the property. *Coe* v. *Cassidy, supra;
Casserly* v. *Witherbee, supra; Chamberlain* v. *Martin*,
43 Barb. 607; *Ballou* v. *Cunningham*, 60 id. 425; *Hal-
stead* v. *Swartz*, 1 T. & C. 559; *Stoddard* v. *Denison*,
38 How. Pr. 296; *Durden* v. *Whetstone*, 92 Ala. 480;
Jones, *supra*, §§ 792, 793. See, also, *Oppenheim* v.
*Moore*, 107 App. Div. 301. There being no express
agreement or statute requiring a sale of the property
by the mortgagee on default, the latter was only obli-
gated to sell in the event she desired to hold the mort-
gagor for any deficiency, but if she so desired, it was
her duty to sell within a reasonable time or she would
be deemed to have elected to retain the property in
satisfaction of the whole indebtedness. *Case* v. *Bough-
ton*, 11 Wend. 106; *Consumers Brewing Co.* v. *Braun*,
147 App. Div. 171; *Hanover Building Co.* v. *Jacobs*, 78
Misc. Rep. 410; Jones, *supra*, §§ 743, 773. It has been
held that an officer authorized by statute to execute a
power of sale contained in a chattel mortgage must,

in the absence of other authority, sell for cash. *Maddox* v. *Rader,* 9 Mont. 126. It is necessarily implied in the authority of a mortgagee to make a sale for which he is to claim credit against the mortgagor that the sale shall not be made in exchange for other property, but shall be for money either paid or promised to be paid. *Williamson* v. *Berry,* 8 How. (U. S.) 494–544; *Edwards & Beardsley* v. *Cottrell & Babcock,* 43 Ia. 194–204. If the mortgage expressly provides that the sale shall be for cash and the mortgagee gives credit, the sale will nevertheless be valid; but the mortgagee takes the risk of payment and must give the mortgagor credit for the price for which the property is sold. *Williams* v. *Hutch,* 38 Ala. 338; *Newburn's Heirs* v. *Bass,* 82 id. 622; *Atkins* v. *Tutwiler,* 98 id. 129; *Ivey* v. *New South Building & Loan Association,* 103 Ga. 585. In Jones on Mortgages (7th ed.) the author, in writing with respect to the foreclosure of mortgages on real estate, expresses the opinion, without citing any authority therefor, that in general where the agreement is silent on the subject, the sale should be for cash unless the mortgagee wishes to extend credit for his share or take the risk of payment, but that selling on credit does not affect the validity of the sale unless the mortgagor is injured thereby, and he says that the mortgagee may sell on credit if a better price can thus be obtained, which would be to the benefit of the mortgagor, even though the mortgage requires that the sale shall be for cash, and he cites authorities from other jurisdictions which tend to sustain that view. See, also, *Thurlow* v. *Mackeson,* L. R. 4 Q. B. 97–109.

Owing to the unique character of the property in question, which has no intrinsic value, but for which very large amounts are paid by a comparatively few individuals in different countries, through the world, who are interested in making and completing collec-

tions of stamps, and owing to the customary manner of selling such property, which differs widely from any custom concerning the sale of other property with which we are familiar, the evidence presents transactions extending far beyond any precedent cited, or which I have been able to find. The rights of the parties must, therefore, be adjudicated on the facts established by the evidence but without much aid from precedents; and the compass of justice must be read and followed in the light shed by the authorities most nearly in point in stating and applying equitable principles.

It must be borne in mind that the agreement was made long after the default and when the legal title was vested in the plaintiff subject only to the right of the assignee to redeem. The default and the validity and amount of the plaintiff's lien at the time of the trial of the foreclosure action had been adjudicated by the judgment in that action, from which a formal appeal had been taken by the assignee; but the time for perfecting the appeal had been extended generally by stipulation and it is evident that it was not intended to prosecute the appeal. The plaintiff was then at liberty to sell the unsold stamps as she was proceeding to do. The evidence, however, clearly shows that by the sale of such property at public auction it is highly probable that as much would not be realized as if the sale were made in the customary manner, by private negotiations, and that it was not for the interests of either party to have a public sale. All parties in interest realized this and the assignee was desirous of avoiding the contemplated sale at public auction, and this desire on his part resulted in his finding a purchaser for the stamps then in the possession of the plaintiff, which enabled him to make the redemption evidenced by said agreement. Some of the stamps of

Misc.]                    Supreme Court, March, 1919.

the Worthington collection had been purchased for him by Colson. Worthington's position financially became such that in May, 1914, he conferred with Colson with a view to selling some of the stamps, and on the 23d of June, 1914, he wrote Colson a letter evidencing a verbal agreement which had been made between them with respect to a sale of stamps on the basis of a percentage of the proceeds of the sales as commissions. The only change thereafter negotiated between Worthington and Colson with respect to the contract was concerning the amount of the commissions, which ultimately became, by mutual consent, twenty per cent of the proceeds of the sales. At that time the title had passed to the plaintiff by the default. Colson testified on this trial that he had no notice of the plaintiff's claim until the 20th of May, 1915; but on the trial of the foreclosure action he testified that he was informed by Worthington, at the time the selling contract was negotiated, that the latter had obtained a loan on the stamps from the plaintiff, but that he was her agent and to make the accounts of sales out in her name and mail them to him. I think it is not very material whether or not Colson was then aware of the plaintiff's title inasmuch as she had good title, which he subsequently recognized by admitting that she had a first lien on the property and that any stamps he received from her or from Worthington he received and held as her agent and by surrendering possession to her of all of the stamps he had at the time of the trial of the foreclosure action; but I am convinced that the testimony which he admits he gave on the other trial was true, and that he knew at the time he contracted with Worthington that the latter was acting as agent for the plaintiff.

It appears that the stamps were not delivered to the plaintiff when the mortgage was made and that Wor-

Supreme Court, March, 1919.        [Vol. 106.

thington retained the custody thereof, and without the
knowledge or consent of the plaintiff he made the sell-
ing contract with Colson and delivered to the latter
part of the stamps, some of which were sold, and the
plaintiff was not informed thereof until nearly a year
thereafter. She then, however, after some protest,
ratified the sales and continued, through Worthington
or direct employment by herself, the services of Col-
son in disposing of stamps. Worthington had marked
a minimum selling price on the stamps and determined
the order in which they should be sold, and from time
to time stamps that it was deemed advisable to dispose
of were delivered to Colson for sale, and Colson, in
making sales, followed the order and kept within the
prices fixed by Worthington and approved by the
plaintiff. During the pendency of the foreclosure
action, and until long after the trial thereof, it was not
expected that there would be any redemption. After
Worthington made the assignment, the assignee ques-
tioned the validity of the plaintiff's mortgage, both
upon the ground that it was never filed and that the
possession of the property was not delivered to her.
That claim on the part of the assignee gave rise to con-
stant disputes between the parties. Both the assignor
and the assignee realized perfectly well that the
stamps could be sold to best advantage at private sale,
as they were being sold through Colson; but the
assignee endeavored to have the plaintiff yield to his
demand for a joint control of the sales by her and
him, and since she would not yield on that point, he
took the position that official he opposed further
sales through Colson and would hold her and Colson
responsible therefor, provided he succeeded in having
it adjudged that her mortgage was invalid. In the
foreclosure action the plaintiff demanded a deficiency
judgment against Worthington. The assignee at one
time manifested willingness to withdraw his objection

to the continuance of the sale of the stamps through Colson if the plaintiff would abandon her claim for a deficiency judgment against Worthington, but this at that time she refused to do. There were certain sales of stamps made by Colson by authority from the plaintiff before judgment in the foreclosure action, which were not disposed of by that judgment for the reason that Colson, who was a witness on the trial thereof, had not reported the sales; and there were other sales made by him thereafter, but none since the agreement of June 22, 1917. The sales before and after judgment are not separated by the evidence. It now appears that there were three sales made by Colson, upon which payments in full were not made by the purchasers. He had reported these sales as having been completed and it was so supposed by both parties when said agreement was made. He testified that he had had prior dealings with the purchasers and that they were financially responsible. The total amount unpaid on those three items aggregates $1,694.15. It also appears by his testimony that it is customary in the sale of stamps to extend credit where the transaction involves any considerable amount, and that such sales are negotiated by personal interviews and there is no written evidence thereof, and that if the purchasers should be pressed for payment, they would likely repudiate the purchases and return the stamps.

Notwithstanding the pendency of the foreclosure action or the judgment therein, the plaintiff had a right, I think, to sell any of these stamps provided the value of the remaining stamps should not be affected thereby as was the case here; and in the exercise of this right she delivered part of them to Colson, part of which he sold, as already stated, and part of which he retained. When the assignee attempted to redeem, Colson refused to return the unsold stamps and the proceeds of the stamps sold, for which he had not

Supreme Court, March, 1919. [Vol. 106.

accounted. In these circumstances the plaintiff was unable, through no fault of hers, to deliver the unsold stamps; but since the commencement of the action they have been deposited in court by Colson. I am of the opinion that the assignee cannot charge the plaintiff with the value of those stamps and that his only right with respect thereto is to have possession thereof delivered to him, the same as if he had sued for redemption. *Bragelman* v. *Daue, supra; Casserly* v. *Witherbee, supra.*

The uncontroverted evidence shows that all stamps sold were sold for their full market value, and it is not to be presumed that they would have brought more if the sale had been at public auction. Therefore, the assignee has not been prejudiced by the sales. The question, however, remains as to whether the plaintiff must credit those sales on her claim or whether the assignee must look to Colson therefor. Colson was the agent of the plaintiff in making the sales and is accountable to her therefor; but if she should be required to give credit for those sales, that would place upon her a possible risk of the loss of part of her claim, whereas, on a redemption, she is entitled to have her claim paid in full. It is not claimed that Colson was not a proper party to employ to sell the stamps or that the plaintiff or Colson was guilty of any negligence with respect thereto. It appears that he is the leading agent engaged in this line of business in this country; and while I have expressed the opinion that he was inaccurate with respect to some of his testimony, there is no reason to doubt that he is an honorable, responsible man. In no view did the plaintiff owe a greater duty to the assignee than that of a *quasi* trustee, and as such she would only be liable for losses through neglect to exercise reasonable care in selecting the selling agent and supervising his acts. There is no reason to doubt that

the outstanding claims against purchasers and Colson are collectible, but if there should be any loss on them, I am of the opinion that, in the circumstances, it should be borne by the assignee and not by the plaintiff. Doubtless the court might defer judgment and require the plaintiff to collect these outstanding claims and account therefor, but if she were so required, she would be entitled to her reasonable expenses and disbursements in so doing, and that course has not been suggested. She should not be charged with the outstanding accounts on the theory that she should have sold for cash, for the evidence shows a very loose general custom in this business, with knowledge of which Worthington was chargeable when he made the mortgage. There was, therefore, an implied agreement that the mortgagee, in exercising her right to sell after default, was to be at liberty to sell according to this custom. The assignee has no greater right than his assignor.

The balance of the plaintiff's lien, on June 22, 1917, after the payment of the $240,409.78, according to a correction of the figures in the agreement made on the trial, was $87,332.21. The plaintiff, since the trial of the issues in the other action, paid $600 to the Manufacturers & Traders Bank for safety deposit vault space; $200 to the Buffalo Loan and Trust Company for like space and $50 for expressage and charges for telegrams in connection with handling the stamps, aggregating $850. These were reasonable and necessary expenses in preserving and disposing of the property, and the mortgagee, therefore, is entitled to have her claim and lien increased by those amounts. *Coe* v. *Cassidy, supra.* It is not entirely clear that these items of expenses were all *incurred* since the trial of the foreclosure action, but they are just claims and no part of them was allowed in the other action. No specific

objection was interposed that they should have been litigated in the foreclosure action, and if there had been, the evidence might have been more clearly developed with respect to what part, if any of them, was incurred before the trial of the foreclosure action. I am of opinion that the amounts claimed for attorney and counsel fees are the reasonable value of the services and shall so find; but I think the plaintiff is not entitled thereto in this action. *Willard* v. *White,* 56 Hun, 581, 589. The authorities on which her counsel relies on this point authorize such charges where litigation becomes necessary in collecting pledged claims or in recovering the property, and where there is an express provision for charges for attorney and counsel fees in the event of a foreclosure of the lien (*Davenport* v. *National Bank,* 127 App. Div. 391; *Bank of Staten Island* v. *Silvie,* 89 id. 467; *Sheldon* v. *Raveret,* 49 Barb. 203; *Leadbetter* v. *Leadbetter,* 32 N. Y. St. Repr. 890); but as the charges are not for such services and there was no such provision in the mortgage, the authorities cited are not in point here. Moreover, in so far as the claims are for services rendered prior to the recovery of the other judgment, that objection was duly interposed and she is concluded thereby. I am of the opinion, therefore, that the plaintiff is entitled to have the amount of her lien and necessary expenses in preserving and handling the property, together with the cost of this action to be taxed, and an additional allowance of $2,000, paid in full out of the fund deposited in court, and the interest payable thereon by the depositary; and that she should execute an assignment in due form and duly acknowledged to the assignee of her claims against the purchasers who have not paid in full, and against Colson.

It is quite clear that Colson is entitled to retain

twenty per cent of the proceeds of sales in his hands,
for which he has not accounted, and to a twenty per
cent interest in the claims against the purchasers who
owe for stamps.  He asserts another claim on the
theory that he has a lien on the moneys and stamps
in his hands, and had a lien on the stamps the sale of
which by the assignee produced the fund which was
deposited in court, possession of which stamps was
not voluntarily parted with by him.  This lien is predi-
cated on the theory that his said contract with Wor-
thington, on June 23, 1914, was for a sale of the entire
Worthington collection; but neither in that contract
nor in any modification thereof, nor in the correspond-
ence or testimony, is there any evidence of an agree-
ment for a lien.  If he had a valid contract for the sale
of the entire collection, that would not give him a lien
on the stamps which were not sold by him.  Moreover,
there is no evidence that Worthington was authorized
by the plaintiff to make such a contract.  Colson never
asserted such a claim to the plaintiff or to the assignee
until the month of March, 1917, when they were
endeavoring to induce him to return the unsold stamps
to the end that they might be examined by intending
purchasers at the contemplated public sale and deliv-
ered to the purchasers at such sale.  On being informed
of the plaintiff's lien, even as claimed by him on this
trial, he asserted no personal right to a lien on the
stamps nor a right to sell the entire collection, and by
a letter of November 8, 1915, to her attorney he for-
mally acknowledged his understanding that she had a
first lien on the entire collection and asserted none in
his own favor.  I am of opinion, however, that the
contract which Worthington assumed to negotiate with
Colson as plaintiff's agent was not a binding contract
for exclusive rights to sell the entire collection.  Col-
son testified to interviews with Worthington tending
to show an agreement by which he was to have the sale

of the entire collection, but the correspondence intended to embody the agreements negotiated at such interviews does not bear him out with respect to the extent of the agreement and shows that he was to sell the whole, or a portion, of the collection as Mr. Worthington might from time to time determine, and that the contract was subject to termination at any time if, in the opinion of Worthington, he was not making satisfactory progress. There is evidence that Worthington was at times quite dissatisfied with the progress Colson had made, and that on one occasion he attempted to discharge Colson and to terminate the contract with the assent of the plaintiff and of the assignee. In such circumstances the correspondence must be accepted as more reliable than the recollection of a party. Counsel for Colson insists that the testimony of his client should be accepted even though it extends the agreement as shown by the correspondence for the reason that Worthington, who was in court, was not called to controvert it; but it was apparent to the court that Worthington was not in a condition mentally to be called as a witness, for many times during the trial the court asked questions with respect to matters of which Worthington had charge, and in no instance was there any attempt by counsel to confer with, or obtain information from Worthington, who was sitting at the table with counsel.

Colson's claim, as asserted in his answer, in addition to the claim for commissions on sales made, is for the reasonable value of services claimed to have been rendered in connection with the sale of stamps on the employment of the plaintiff or of the assignee, or both. There is no specific claim pleaded with respect to a breach of contract for the sale of the entire collection. It is doubtful whether the cause of action now urged for damages for breach of contract for the sale of the entire collection nor for commissions on the

sale made by the assignee would be embraced in the answer; but since I am of opinion that such a contract was not made, it is not necessary to consider that question. Assuming that the contract as made by Worthington with Colson, and evidenced by the correspondence, was binding on the plaintiff, it was terminable at any time, for it rested with Worthington, or his principal, to determine from time to time what stamps, if any, were to be sold, and the express right to terminate the employment if the progress of the sales was not satisfactory was reserved. *Crawford* v. *Mail & Express Publishing Co.,* 163 N. Y. 404; *Kramer* v. *Wilson,* 92 Misc. Rep. 159; *Acquinti* v. *Fischer,* 165 N. Y. Supp. 369. The decision which I feel bound to render seems hard on Colson, for he expended much time and money in unsuccessful efforts to make sales; but his compensation depended on results and his endeavors were of no benefit, or advantage, to the plaintiff save as sales resulted. He also devoted much time and incurred large expenditures in assisting and trying to assist Worthington financially. There was no agreement that he was to be paid for such services or reimbursed for the expenditures. He was doubtless actuated in so doing both by friendship and a desire to avert financial disaster to Worthington, which might have precipitated the termination of the selling agency on which he counted with very high expectations, for it appears that he was of opinion that this collection was worth $1,000,000 and that it would net on judicious sales $700,000. He, however, performed services in remounting certain groups of the stamps, which were necessary to render them salable to the best advantage, and his services in this regard were ratified and approved by Worthington, who was acting as the agent of the plaintiff. Those services, he testified, were reasonably worth $1,650, and his testimony is not

controverted. He was deprived of the benefit of these services by being called upon to surrender those stamps, and the plaintiff and the assignee have had the benefit of the work he performed in remounting the stamps, in that the plaintiff was enabled thereby to deliver them in their more valuable condition to the assignee, who negotiated a sale thereof, upon which he realized the money with which he made the redemption. That item was, I think, a proper charge as between Colson and the plaintiff; and if so, it was a proper charge between the plaintiff and the assignee. Colson, therefore, is entitled to deduct from the moneys in his hands for these services this item for services in remounting stamps, and his commissions on the stamps sold; and he is accountable to the plaintiff for the balance of the money in his hands, and she should assign her right thereto to the assignee, and she should also assign to Colson a one-fifth interest in the outstanding accounts for stamps sold, unless the parties agree to a different disposition with respect to the outstanding accounts before the settlement of the decision to be entered herein. Colson is entitled to appropriate findings and conclusions of law to the effect that neither by his surrender of possession of the stamps which were sold by the assignee nor by the delivery of the remaining stamps into court did he waive or lose any right he had in the premises.

A decision in accordance with these views and awarding the stamps and the balance of the fund to the assignee may be presented for settlement on notice; and at that time I will pass upon any proposed findings that may be presented in behalf of Colson and on any additional findings that may be proposed by the other parties and any questions that may arise with respect to allowances of interest.

Ordered accordingly.